LEOPOLD MORSE TAILORING COMPANY

v.

The UNITED STATES.

No. 104–66.

United States Court of Claims.

March 14, 1969.

Edwin J. McDermott, Philadelphia, Pa., attorney of record, for plaintiff.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant, Manfred J. Schmidt, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND ON PLAINTIFF'S REQUEST FOR REVIEW OF THE COMMISSIONER'S ORDER

PER CURIAM:*

This review of a decision of the Armed Services Board of Contract Appeals (Leopold Morse Tailoring Co., ASBCA No. 8147, 1963 BCA ¶ 3861, at 19, 209) on cross-motions for summary judgment, presents a preliminary issue as to the formalities attending execution and approval of the Board's opinion, another preliminary question as to the plaintiff's right to amend its petition, and six issues on the merits concerning alleged delays for which compensation is sought.

The first preliminary question hinges on two alleged technical deficiencies in the signing of the Board opinion which plaintiff contends voids it and per-

---

* This opinion is based on that of Trial Commissioner C. Murray Bernhardt, with additions and modifications.

mits this court to reach an independent determination of the basic issues presented without the finality impediment of the Wunderlich Act, 41 U.S.C. § 321 (1964). The two alleged deficiencies are (1) that the opinion was authored and signed by an "acting vice-chairman" of the Board, an office not authorized by the Board's charter, and (2) the opinion was approved by the "acting vice-chairman" after the expiration of his temporary appointment as such. These same two points were presented at an earlier stage (when the plaintiff sought a *de novo* trial in this court) and were summarily rejected by the court in an order dated September 29, 1967. That order is now the law of the case. In any event, unless we exalt mere form over substance there is nothing to either contention to warrant nullification of the Board's opinion. Paragraph 2 of the Board's charter authorizes the chairman, in the absence of a vice chairman, to "designate a member of the Board to serve as a temporary vice-chairman". Hugh B. Archer, the Board member who presided at the hearing and authored the opinion, signed it as "acting vice chairman". He had been named as such for the period August 26 through 30, 1963, in the temporary absence of one of two vice chairmen. The semantic variance between "acting" and "temporary" vice chairmen, on which the plaintiff's slender point relies, does not disclose an intention to designate a different office and would be a shallow pretext for discrediting the finality of the Board's opinion, without a showing of prejudice to the claimant arising from what was obviously a slight and harmless misnomer. Much the same may be said as to the second point in this phase of the argument that, while the opinion is dated August 30 and Mr. Archer's authority as acting vice chairman expired on that date, the circumstantial positioning of the opinion in the bound Board record given the court infers that it was actually signed and approved by Mr. Archer in his designated capacity on or after September 4, and thus was *ultra vires*. Overlooking the Government's reply that the Board charter requires that the opinion need be approved only by the Board chairman and one of its two vice chairmen—which it was—it is simpler to rely on the obvious fact that, if it was signed by Mr. Archer after the expiration of his authorization as acting vice chairman, his action in signing as of the earlier date of August 30 was *nunc pro tunc* and perfectly valid. His authorization as acting vice chairman would certainly extend to approval as such vice chairman, on September 4th, of a Board decision which he had himself issued while he was acting vice chairman.

 Furthermore, the technical deficiencies complained of could and, therefore, should have been presented to the Board by plaintiff on a motion for reconsideration before that body, and not years later in the course of court review. The plaintiff is charged with knowledge of the Board's charter, including that provision authorizing the appointment of a temporary vice chairman. So charged, when plaintiff first saw or could have seen the alleged imperfection in the execution and approval of the opinion by Mr. Archer as acting vice chairman, it then had opportunity and visible cause to challenge its sufficiency on that score. And in the course of exploring that issue on a motion for reconsideration it may well have come across the further tentative circumstance that Mr. Archer may have executed or approved the opinion subsequent to the expiration of his acting vice-chairmanship, so that plaintiff's remedy lay wholly and properly within the Board which, had it been impressed, could have effected a necessary correction at that juncture.

The second preliminary issue is whether plaintiff can now amend its petition to ask for reformation of the contract. This, too, has already been decided adversely to plaintiff. The petition in this court was filed on March 28, 1966, and said nothing about reformation. Two years later, in April 1968, plaintiff moved for leave to amend its petition un-

der Rule 22(a) ("Amendments") because "the contract fail[ed] to express the prior mutual agreement of the parties and the Court is requested to reform the contract". The commissioner denied leave on May 2, 1968, and the court affirmed by an order of June 7, 1968. The implicit but unstated ground of that order was that plaintiff was much too late in proposing this amendment, and had no adequate excuse for the delay. Shortly thereafter (in July 1968) plaintiff again asked for leave to amend in order to set up a cause of action for reformation—this time under Rule 22(b) ("Amendments To Conform to the Evidence"). The commissioner likewise denied this motion and plaintiff again seeks review by the court. We make the same ruling now as we did when the proposed amendment was previously sought, and for the same reason. Plaintiff has delayed far too long and given no sufficient excuse. Moreover, Rule 22(b) does not apply at all since no issues have been tried in this court "by express or implied consent of the parties"; the case is before us solely on the administrative record, for review under the Wunderlich Act, and it is indisputable that the issue of reformation was not, and could not be, tried before the Board.

We go on to the delay claims, which allege two periods of Government-caused delay, the first from August 29 to October 11 (see section 1–5, inclusive, *infra*), and the second from November 14 to December 16, 1957 (see section 6, *infra*).

### 1. *Delay in accepting plaintiff's bid.*

■ Invitations to bid were sent by Army Quartermaster to contractors on January 10, 1957, for 15,000 to 30,000 men's wool velour overcoats for Air Force use. Plaintiff submitted a timely bid. Bid opening was January 30, and an award was due 60 days later on March 29. An intramural dispute within the Department of Defense between the Air Force and Army Quartermaster over whose funds would be charged with the procurement prevented a timely award. Eligible bidders were requested and granted the Government an extension until April 15 for bid acceptance. Subsequent extensions for the award were granted by plaintiff at Government request to April 30, May 15, June 15, and—finally—June 30. On June 27, 1957, plaintiff was awarded the contract for 22,260 overcoats, with prescribed delivery dates. By its acquiescence in the extensions and by acceptance of the contract plaintiff clearly waived any claim for the Government's delay in making the award.

### 2. *Delay in approving plaintiff's subcontract with Van Siclen Clothes, Inc.*

■ Due to the Government's delay in awarding the contract and resulting uncertainty as to whether its plant facilities would be available to discharge it, the plaintiff planned, with Government knowledge, to subcontract to another contractor having available facilities, subject to Government approval. On July 30, 1957, plaintiff requested permission of the contracting officer to subcontract to Van Siclen Clothes, Inc. (hereafter Van Siclen, or subcontractor), a contingent subcontract of that date having been entered into. At the contracting officer's intimation that the subcontract might be deficient, on August 13 plaintiff notified the Government that the subcontract with Van Siclen had been modified to adjust the delivery dates to conform indisputably to all terms of the prime contract. The modified subcontract was approved by the contracting officer by telegram on August 19, 1957. Plaintiff made no claim to the contracting officer for this delay and denies the Government's contention that there was a remedy under the contract. Regardless of whether or not there was an administrative remedy which plaintiff failed to exhaust, the factual circumstances do not indicate that the Govern-

ment delayed its approval of the subcontract unreasonably. The contracting officer feared that the subcontract in its original form might be unenforceable because it provided for delivery of coats starting September 24, while the prime contract required the delivery of GFP (government-furnished property) at least 60 days prior to any delivery date required for the completed coats, a time antedating the modified subcontract. The contracting officer's letter of August 8 disapproving the subcontract conveyed this advice to plaintiff, and on August 13 plaintiff informed the contracting officer that the problem had been solved by modifying the subcontract delivery dates to start October 19. The Government's position was reasonable and not in breach of any obligation under the contract.

### 3. Delay in shipment of Government-furnished material to subcontractor.

■ Plaintiff has asked for unspecified damages for delay in shipment of Government-furnished wool velour to the *subcontractor*. The first shipment of such material for use in manufacturing most of the first installment of completed coats due September 24, which material was due the contractor 60 days prior to September 24, or July 25, was delivered to plaintiff July 24 and the next lot was delivered to plaintiff August 6. Plaintiff contends it should have been delivered instead to the subcontractor, ignoring the fact that the Government could not have delivered the material to the subcontractor until August 19 at the earliest when the subcontract was finally approved in modified form. Subsequent deliveries of material were made to the subcontractor.[1] Moreover, having failed to seek from the contracting officer the equitable adjustment afforded for such a claim by the Govern-

ment-Furnished Property clause of the contract, even if there were some merit to the claim it is now barred for failure to exhaust administrative remedies.

### 4. Delay due to change of schedule of sizes.
### and
### 5. Delay in furnishing and approving patterns.

■ These two delay claims are linked for discussion because of their close connection. The contract obligated the Government to provide patterns from which the contractor was to make working patterns which had to be approved by the Government before they could be used. The contract also provided a schedule of sizes for the overcoats and specified the number of coats in each size for successive delivery installments commencing September 24, later changed to October 22, because of the earlier delay in furnishing patterns. The following chronology of events controls the disposition of the controversy as to the Government's liability for delay in furnishing and approving the patterns and for delays caused by changing the schedule of sizes:

*July 26*—Patterns due from Government.

*August 5*—Plaintiff complained to Government that it had not received patterns.

*August 8*—Government promised that patterns would be available shortly.

*August 22*—Plaintiff received Government patterns and ordered supplier to prepare working patterns for those 11 sizes specified in original contract for first delivery.

*August 28*—Plaintiff received telephone notice of change in required sizes. Written confirmation was received by plaintiff September 2. The change in

---

1. Except for two final deliveries made to plaintiff for manufacture of part of the order which plaintiff eventually took over from the subcontractor.

the 11 sizes required for the first delivery installment did not affect the total of 2,310 coats in that installment, but deleted five sizes, added one size, and changed the number of coats in six sizes as shown in the following table:

| Size | Original | As changed |
|------|----------|-----------|
| 33R | 70 | None |
| 33S | 80 | None |
| 35R | 640 | 790 |
| 35S | 280 | 530 |
| 35L | 200 | None |
| 35XL | 20 | None |
| 37L | 590 | 130 |
| 37XL | 280 | 330 |
| 43XL | 70 | 160 |
| 45R | None | 200 |
| 45L | 10 | None |
| 45XL | 70 | 170 |

For subsequent delivery installments the order for change in sizes provided four additional sizes, but that is not germane to our problem.

*August 29*—Government received plaintiff's request of August 28 for permission to transfer GFP in its possession (shipments of July 24 and August 6) to subcontractor.

*September 2*—Plaintiff ordered new size labels from supplier, including the extra size added by the order for changes in size. Each coat was required to have a label on the inside breast pocket which would state the garment size. Before ordering its labels, the contractor would have to know the number of labels required for each coat size. The August 28 change in coat sizes thus required plaintiff to order its labels in the proper quantity and sizes to match the changed quantities and sizes of coats.

*September 6*—Subcontractor received and paid for working patterns from supplier for 12 coat sizes, apparently including the 11 sizes specified in the original contract and an additional size required by the change in sizes.

*September 6*—Government approved plaintiff's request of August 28 to transfer GFP to subcontractor.

*September 11*—Plaintiff shipped GFP to subcontractor.

*September 16*—Subcontractor received GFP from plaintiff.

*September 18*—First cutting by subcontractor of 300 coats.

*September 19*—Second cutting by the subcontractor of 300 coats.

*September 20*—Government inspection and approval of working patterns. (Possibly this approval took place on September 18.)

*September 23*—Unidentified shipment of labels by supplier to plaintiff.

*October 10*—Labels ordered September 2 in three sizes shipped to plaintiff by supplier.

*October 14*—Labels received by plaintiff from supplier.

Analysis of the foregoing sequence of events justifies certain conclusions. For some undisclosed reason the plaintiff waited until July 30 to subcontract to Van Siclen and to request Government permission to do so. Due to a claimed technical deficiency in the subcontract for which it is not established that the Government was at fault, see Section 2, *supra,* official sanction of the subcontract was not forthcoming until August 19. Until then nothing except ordering of thread and miscellaneous non-GFP items could be legally commenced on contract performance, even if GFP and pat-

terns had been on hand for cutting. Moreover, the GFP had to be on hand in the subcontractor's plant, and plaintiff did not request authority to transfer its available supply of GFP to the subcontractor until August 28. Approval of the transfer of GFP was given on September 6, the GFP was shipped to the subcontractor September 11, and received by the subcontractor September 16, a total elapsed time of 19 days from the date of the plaintiff's request. Had plaintiff made its request for GFP transfer at its earliest opportunity on August 19 when the subcontract was approved by the Government, we might then fairly assume, using the actual time interval of 19 days calculated above, that the subcontractor should have received the GFP from plaintiff by September 9 (September 8 being a Sunday), instead of the actual date of receipt of September 16. Thus far no actionable fault is found on the Government's part for the delays.

█ Plaintiff's working patterns were on hand September 6, but were not approved by the Government until September 18 or 20,[2] and therefore were not permitted to be used until then. Assuming that the defendant's delay in inspecting and approving the patterns was undue, still the record is plain that plaintiff suffered no substantial injury. The goods were not received by the subcontractor until September 16 (through no fault of the Government). Cutting actually began on September 18 (300 coats) and September 19 (300 coats).[3] It follows inexorably that the subcontractor was delayed by the failure to approve the patterns only for one or two days at most (if it was delayed at all). This delay was de minimis in the circumstances.

As for the delay charged to the changes in sizes, those changes, too, had no substantial effect on production, especially in view of the fact that cutting by the subcontractor could not begin until September 16 at the earliest (the date it received the goods from plaintiff). The net detrimental effect of the size changes on August 28 was merely to add one additional size. The working pattern for that extra size could have been obtained very quickly if promptly ordered on an expedited basis,[4] and in any case the number of coats required on the first delivery for that additional size was only 200, an inconsequential proportion of the 2,310 total number of coats to be delivered on the first installment.

Another hitherto unstressed factor enters into this cause-and-effect equation, and that is the problem of labels which had to be ordered in required quantities and size numbers to match the August 28 size changes. Plaintiff ordered labels from a supplier on September 2, they were shipped to plaintiff in two lots on September 23 and October 10, and received by plaintiff October 14.[5] Plaintiff's contention that the coats could not be manufactured until the new labels necessitated by the change in sizes were on hand does not survive the record proof that approximately 40 percent of the manufacturing operations could be accomplished up to the point the labels

2. The Board's opinion is unclear as to the precise date. At one point it says that "it was not until 20 September that the inspector reported to his agency that the working patterns had been checked and found satisfactory". Later, the opinion says: "The record before us further establishes that the working patterns were approved prior to the first lay of material on 18 September. This fixes the time of inspection and approval no later than a day or a day and a half after receipt of the goods at the Brooklyn plant."

3. As indicated in note 2 supra, it is unclear whether the cutting occurred after the approval of the patterns or whether the subcontractor took the risk and "jumped the gun".

4. The defendant furnished the patterns to plaintiff on August 22, instead of July 26 as scheduled. This delay was the basis for Modification No. 4 to the contract, dated December 18, which changed the original delivery date for completed coats 24 days from September 24 to October 22. The extension was informally promised to plaintiff as early as August 13, and corroborated in writing October 1.

5. The label record as to order, shipment and receipt is obscure.

were required for insertion on the inside breast pocket of the lining. Workers who were temporarily idled by the absence of labels could have been profitably switched over to work on other parts of the garment without unduly disrupting an efficient work flow. Moreover, no reason is given as to why labels were not ordered much closer to the June 27 date of the original contract award instead of September 2 when the unanticipated order to change sizes was received, a telephoned notice of the changes having been given August 28. If they had been, then the subcontractor would have had enough labels to attach to all but 840 of the coats for the first delivery installment, and the 840 missing labels could have been attached later when received on a forthcoming order.

### 6. Stop shipment order for GFP.

■ The GFP office issued a stop shipment order on further shipments of GFP to plaintiff on October 4, and the order was rescinded November 12, with the first delivery of GFP thereafter arriving November 22. The plaintiff claims that, because of this hiatus, its subcontractor ran out of wool velour and had to discontinue all manufacturing operations from November 14 to December 16. The subcontractor would have resumed December 6, but a subway strike from December 9 to December 16 prevented its employees from commuting to and from work, and hence precluded the resumption of operations, a circumstance clearly not attributable to the Government.

The Board rejected plaintiff's basic contention on two principal grounds: (1) it was unreasonable for the subcontractor to shut down its plant when it expected delivery of GFP within three weeks and it had cut components on hand sufficient for more than seven weeks of production in assembling them into completed coats, and (2) the real reason for the plant shutdown was the pendency throughout the shutdown period of plaintiff's requests for waivers of specification requirements, i. e., so-called "deviation requests". Three other defenses raised by the Government at the administrative hearing were not passed on by the Board.

On or about September 26, in an effort to expedite performance, the plaintiff modified the subcontract by assuming responsibility for manufacturing 7,550 coats, thus relieving Van Siclen of all but 14,710. The contracting officer was then concerned over the prospective delinquency in the first installment of coats due October 22. On October 1 he was aware that the subcontractor had been cutting since September 18 and had commenced sewing operations September 30, and asked plaintiff what corrective action could be taken to avert the threatened delinquency. On October 2 plaintiff advised the Government that it would need 6,000 yards of cloth weekly. The GFP office informed plaintiff on October 4 that further shipments of GFP would be withheld until resumption of normal production by plaintiff "Since you have not cut any items against a total of 22,-260 overcoats as of 24 September 1957 * * *", a demonstrably erroneous statement. A small shipment of wool velour arrived October 7, apparently sent prior to the stop shipment order. The status of wool velour shipments *versus* contract requirements as of then is shown in the following table:

| Date required | Date received | Cumulative quantity required (yds) | Cumulative quantity shipped (yds) |
|---|---|---|---|
| 23 August | 24 July | 5,938 | 5,909 |
| 23 September | 6 August | 17,815 | 12,506 |
| 23 October | 25 September | 29,692 | 18,505 |
| 24 November | 7 October | 41,568 | 24,499 |

Thus, as of October 23, the Government owed plaintiff 5,193 yards of wool velour. On November 11 the plaintiff informed the contracting officer that its subcontractor had only enough wool velour left to cut 300 coats and needed 18,000 to 20,000 yards immediately. On November 12 the contracting officer, who evinced surprise at his lack of knowledge of plaintiff's predicament, instructed the GFP office to release the stop shipment and on November 15 advised plaintiff that the GFP was being expedited. On November 22, 14,797 yards arrived. In the meantime the subcontractor ceased virtually all operations in its shop on November 14, by which time it had cut 8,900 coats, 6,150 of which were in various stages of assembly into coats.

As seen by the Board, the problem posed by these facts was not so much whether the Government was justified in suspending shipments of GFP (which the contract permitted be done if performance were endangered), but whether the subcontractor on this account was justified in closing down all operations on November 14 when it had 6,150 coats in process, and whether other reasons (besides cloth shortage) attributable to the subcontractor motivated the shutdown. The Board concluded that "no production delay was caused by lack of wool velour", because the 6,150 coats in process would have provided about seven and one-half weeks of work on a well-balanced line, so "it was unreasonable to cease all operations simply because of insufficient material to furnish six days'. cutting operations [6] especially when no additional property was due for one week and even if it was not expected for three". It

did not accept plaintiff's explanation of the manufacturing justification for failure to employ its work force in completing coats already cut and in process of assembly. The pendency of plaintiff's deviation requests during the shutdown period confirmed the Board's view that the shutdown was to serve the subcontractor's preference to await ruling on the deviation requests.

Had the subcontractor continued its performance by assembling coats in process, its cutting operations would have been suspended for only a week since 14,797 yards of material arrived November 22. A flu epidemic during the shutdown period was also given by the subcontractor as a reason contributing to its inability to function during an undisclosed part of that period.

We cannot say that the conclusions reached by the Board were not supported by substantial evidence in the record, and those conclusions do not really rest on whether or not the cessation of supplies was justifiable. The plaintiff does not even endeavor to rebut the Board's basic finding that the subcontractor could have busied itself in completing coats that were already cut, nor does it challenge the finding that it served the subcontractor's interests to wait for action on its deviation requests instead of going ahead with the work on hand in the realistic expectation of getting new supplies of material in short order.

Plaintiff has not proven a case for recovery. Its motion for summary judgment is denied and the Government's cross-motion is granted. The petition is dismissed.

6. This apparently refers to the interval of six working days between the shutdown on November 14 and the first delivery thereafter of GFP on November 22. Of course, the subcontractor did not know when it shut down on November 14 just ·

when GFP would arrive, although the stop shipment order had been rescinded on November 12 and on November 15 plaintif was advised that the GFP was being expedited.